Tracy Pauline **BOTTO**, Appellant,

v.

**COMMONWEALTH of Kentucky,** Appellee.

No. 2005–CA–002081–MR.

Court of Appeals of Kentucky.

Dec. 15, 2006.

Discretionary Review Denied by Supreme Court May 16, 2007.

Ramon McGee Louisville, KY, for appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Kristin N. Logan, Assistant Attorney General, Frankfort, KY, for appellee.

Before COMBS, Chief Judge; ACREE, Judge; KNOPF,[1] Senior Judge.

1. Senior Judge William L. Knopf sitting as Special Judge by assignment of the Chief Jus-

*OPINION*

COMBS, Chief Judge.

Tracy Pauline Botto appeals from a judgment following her conditional plea of guilty to first degree possession of a controlled substance and possession of drug paraphernalia. She entered her plea on September 13, 2005, in Hardin Circuit Court and reserved for appeal the opinion and order of the court denying her motion to suppress drug evidence recovered by police in a warrantless search. The two issues on appeal are: (1) whether Botto was "seized" in the context of the Fourth Amendment when she allegedly gave her consent to the search and (2) whether her consent was voluntary.

The incident that led to Botto's arrest occurred on October 18, 2004, at a Kroger store in Elizabethtown, Kentucky, where Botto was employed in the floral and produce department. Major Troy Dye of the Elizabethtown Police Department was working in the store as a loss prevention officer. He noticed a white male, later identified as Ray Dupin, wearing a black baseball cap with the caption "police" printed on it. Dupin was buying an excessive quantity of kitchen matches.

Dye became suspicious since matches contain an ingredient that may be used in the manufacture of methamphetamine. He contacted Officer Fegget of the Elizabethtown Police Department and described the suspect to him. Officer Fegget, Detective Clint Turner, and another unidentified police officer headed to the Kroger store. Dye continued his surveillance of Dupin as he paid for the matches, went to the parking lot in front of the store, and placed his purchases in the front passenger seat of a white Jeep. Dupin returned to the front of the Kroger store to buy a soft drink from a machine; he then headed back to the Jeep.

The Jeep belonged to Botto's boyfriend, Jackie Jaggers, who had driven Dupin to Kroger ostensibly to purchase groceries for his mother. Jaggers entered the Kroger store and approached Botto, who decided to take a break from work. After informing her supervisor and clocking out, Botto and Jaggers walked out of the store toward the white Jeep where Dupin was standing.

When the police officers arrived at the parking lot, they saw Dupin, Jaggers, and Botto standing together near the white Jeep. Detective Turner identified Dupin as the man described by Dye. He himself also recognized Dupin as having a reputation for being involved in the methamphetamine trade. Detective Turner and Officer Feggett approached the group while the third officer remained in his car. Turner asked Dupin and Jaggers for their identification. Turner testified that both men complied and consented to be searched.

Botto, however, attempted to return to the Kroger store while Turner was searching Jaggers. Turner testified that he asked her to return, recalling his words: "Ms. Botto, can you come back here please?" According to Turner, Botto also consented to a search. He testified that he requested the search because "meth users usually run with other meth users." In the pocket of Botto's uniform smock, he found a case for sunglasses. In it he found two aluminum foil strips containing a black burnt substance that he believed to be methamphetamine and a partially burned ballpoint pen casing. He arrested her and took her to the police department. Turner testified that he advised Botto of her rights and that she signed a waiver-of-

tice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

rights form. She admitted that the substance in the foil was methamphetamine, that she had obtained it from an individual at work, and that she had some pipes and methamphetamine at her home. She and Jaggers consented to a search of their residence.

At the suppression hearing, Botto's testimony concerning her encounter with the police differed dramatically from Turner's version of the events. She testified that she, Jaggers, and Dupin were surrounded by the officers upon arriving at the Jeep and that they were all told to remain where they were because the officers had some questions to ask. Botto told them that she had to get back to work. She had recently suffered a broken ankle and was wearing a leg brace; she explained to the police that the leg was painful and she wanted to get back into the building. The officers allegedly told her that if she were in pain, she could sit in the back of one of the cruisers. Turner asked her if she "had anything on her" and announced that he was going to search her. She claimed that he reached into the pocket of her work smock without permission and retrieved the sunglasses case.

She testified that she did not feel that she was free to leave nor did she believe that she had any choice regarding the search. She also stated that she was not told she was being arrested until she was placed in the interrogation room at the police department. She stated that she was told to sign the waiver-of-rights form and that it was "just a formality." She said that she skimmed the form but did not read it carefully before signing because she had already been questioned in the parking lot.

Botto filed a motion to suppress the physical evidence discovered during the search as well as her statements to the police. The motion was denied, and she entered a conditional plea of guilty. The court imposed a sentence of three years—to be probated for five years. This appeal followed.

We shall first consider the standard governing our review.

An appellate court's standard of review of the trial court's decision on a motion to suppress requires that we first determine whether the trial court's findings of fact are supported by substantial evidence. If they are, then they are conclusive. Based on those findings of fact, we must then conduct a *de novo* review of the trial court's application of the law to those facts to determine whether its decision is correct as a matter of law.

*Commonwealth v. Neal,* 84 S.W.3d 920, 923 (Ky.App.2002) (citations omitted).

In reviewing and analyzing the evidence presented at the suppression hearing, the trial court concluded that Botto's initial encounter with the police was not a seizure that triggered the protections of the Fourth Amendment. In *United States v. Drayton,* 536 U.S. 194, 200, 122 S.Ct. 2105, 2110, 153 L.Ed.2d 242 (2002), the United States Supreme Court held that a law enforcement officer does not violate the Fourth Amendment's prohibition of unreasonable seizures "merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." Under *Drayton,* the trial court found that it was permissible for the police to question Botto and to ask for her consent to search her person—even if they did not have a basis for suspecting illegal activity on her part. The court found that Botto was free to refuse the request for consent to search at any time, concluding that:

since the Defendant had the right to refuse and the law enforcement officer has the right to ask for consent, then the consent, absent a showing of undue per-

suasion, was freely given and eliminates any unreasonable search and seizure claims.

The court also found that Botto's statements at the police station had been made voluntarily. Although the waiver-of-rights form that she signed clearly informed her of her right to remain silent, she nonetheless chose to make incriminating statements to police.

On appeal, Botto argues that her interaction with the police was not the kind of consensual encounter authorized under *Drayton*. Instead, she contends that it was a seizure that violated her Fourth Amendment rights because it was not supported by reasonable suspicion. As a consequence, her consent to the search and her statements at police headquarters were inadmissible as the "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Finally, she contends that Detective Turner's testimony alone was insufficient proof that her consent to the search was voluntary.

■ The application of *Drayton* to the facts of this case is not an automatic *carte blanche* in support of the seizure issue.

Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage-provided they do not induce cooperation by coercive means. **If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.** (Emphasis added.)

■ *United States v. Drayton, supra,* 536 U.S. 194, 200–201, 122 S.Ct. 2105, 153 L.Ed.2d 242. Dye testified that he asked Botto to come back when she attempted to leave the scene. Botto was trying to terminate the encounter by going back to the Kroger store when she was asked to re-turn. Under these circumstances, we certainly cannot say as a matter of law that a reasonable person would have felt free to terminate the encounter. For purposes of the Fourth Amendment, *Drayton* compels us to conclude that Botto was seized by the police.

We nonetheless are persuaded that Botto's proximity to Dupin under the circumstances created reasonable suspicion to support a brief, investigatory stop.

In the seminal case of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a brief investigative stop, detention and frisk for weapons short of a traditional arrest based on reasonable suspicion does not violate the Fourth Amendment.

■ *Baltimore v. Commonwealth,* 119 S.W.3d 532, 537 (Ky.App.2003). Under *Terry,* the officer's suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. In order to determine whether a seizure is reasonable, we must undertake a balancing test by reviewing:

the totality of the circumstances, taking into consideration the level of police intrusion into the private matters of citizens and balancing it against the justification for such action.

*Baker v. Commonwealth,* 5 S.W.3d 142, 145 (Ky.1999).

■ When the police arrived at the Kroger parking lot, Botto was in the company of a methamphetamine trader known to one of the police officers. They were standing near a vehicle that contained his recently purchased large quantity of an ingredient used in the manufacture of methamphetamine. In light of these facts, coupled with Dye's experience that methamphetamine users "usually run with other meth users," we conclude that there was adequate support for a reasonable sus-

picion that Botto might be involved in criminal activity and that a brief investigatory stop was justified.

Botto has compared her situation to the scenario in *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), in which the United States Supreme Court held that the police had no reasonable suspicion to stop and question an individual solely because he had conversed with several known narcotics addicts. In *Sibron,* however, there was absolutely no evidence that any of the addicts—or Sibron himself—either was in possession of illegal substances or was about to commit any crime. In contrast, Dupin, a known methamphetamine dealer, had *just purchased* large quantities of a methamphetamine precursor and was standing with Jaggers and Botto. Any or all of them arguably could have fled with the evidence in the Jeep.

Botto also contends that Dye's testimony alone was not sufficient proof that her consent was voluntarily given. Case law defers to the discretion of a court in determining witness credibility in conjunction with substantial evidence:

> [w]hen the trial court is faced with conflicting testimony regarding the voluntariness of a confession, its determination, including its evaluation of credibility, if supported by substantial evidence, is conclusive.

*Henson v. Commonwealth,* 20 S.W.3d 466, 469 (Ky.1999). *Sanborn v. Commonwealth,* 975 S.W.2d 905, 909 (Ky.1998), reinforces *Henson* as follows:

> When the trial court conducts an evidentiary hearing, the reviewing court must defer to the determinations of fact and witness credibility made by the trial judge.

RCr (Kentucky Rules of Criminal Procedure) 9.78 is in agreement: "[i]f supported by substantial evidence the factual findings of the trial court shall be conclusive."

Dye's testimony, which the trial court determined was credible, provided substantial evidence to support its finding that Botto voluntarily consented to the search.

■ Similarly, the trial court found that Botto's waiver of rights was voluntary. The court described in some detail that the waiver form signed by Botto was entitled "YOUR RIGHTS" in bold print. The first sentence stated: "before we ask you any questions, you must understand your rights...." The first right listed was "you have the right to remain silent." The court observed that Botto is an adult and that she made no claims of illiteracy, a learning disability, or any impairment that would have prevented her from reading and understanding the form. Thus, its finding as to the voluntariness of her waiver was also supported by substantial evidence and may not be disturbed on appeal. We find no error.

We affirm the opinion and order of the Hardin Circuit Court denying the motion to suppress.

ALL CONCUR.